# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 04-77

STATE OF LOUISIANA

VERSUS

COREY MARQUEE ADAMS,
WHITNEY BATISTE, and
HORATIO ADAMS

************

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT,
PARISH OF LAFAYETTE, NO. 93424,
HONORABLE PATRICK MICHOT, DISTRICT JUDGE

************

## MICHAEL G. SULLIVAN
## JUDGE

************

Court composed of John D. Saunders, Michael G. Sullivan, and Elizabeth A. Pickett, Judges.

**AFFIRMED IN PART; REVERSED IN PART; GUILTY PLEA OF HORATIO ADAMS AND SENTENCE FOR SECOND DEGREE BATTERY REINSTATED.**

**Michael Harson**
  District Attorney
**Keith A. Stutes**
  Assistant District Attorney
**Post Office Box 3306**
**Lafayette, Louisiana  70502-3306**
**(337) 232-5170**
**Counsel for:**
        **State of Louisiana**

**Carey J. Ellis, III**
**Louisiana Appellate Project**
**Post Office Box 719**
**Rayville, Louisiana   71269**
**(318) 728-2043**
**Counsel for Defendant/Appellant:**
**        Corey Marquee Adams**

**G. Paul Marx**
**Louisiana Appellate Project**
**Post Office Box 82389**
**Lafayette, Louisiana  70598-2389**
**(337) 237-2537**
**Counsel for Defendant/Appellant:**
**        Whitney Batiste**

**Sherry Watters**
**Louisiana Appellate Project**
**Post Office Box 58769**
**New Orleans, Louisiana  70518-8769**
**(504) 723-0284**
**Counsel for Defendant/Appellant:**
**        Horatio Adams**

**Corey Marquee Adams**
**Pro Se**
**Louisiana State Prison**
**Angola, Louisiana  70712**
**Defendant/Appellant**

SULLIVAN, Judge.

Brothers Corey Adams, Horatio Adams, and Whitney Batiste appeal their convictions for the second degree murder of Jimmie Chandler. For the following reasons, we affirm Corey and Whitney's convictions and Corey's sentence; we reverse Horatio's conviction and reinstate his guilty plea and sentence.

### Facts

At approximately 3:30 p.m. on Thanksgiving Day in 2001 in Lafayette, Jimmie Chandler was walking to a store to buy a disposable camera for another resident of the halfway house where he lived. About the same time, Corey Adams was driving in the vicinity; his brothers, Horatio and Zachary Adams were passengers in the car. Corey parked his car near a building where Mr. Chandler was walking, and all three got out of the car. Corey and Zachary remained near the car, while Horatio walked behind the building.

As Mr. Chandler walked by Corey and Zachary, Corey called out to him. Mr. Chandler responded, and the men began arguing. The argument quickly escalated into physical violence. Corey hit Mr. Chandler with a stick, and Zachary punched him. At some point, Corey threw or discarded the stick and resorted to using his fists. Returning to the scene, Horatio also began punching Mr. Chandler. Suddenly, Whitney[1] appeared on the scene with a knife and began stabbing Mr. Chandler while the others continued to hit him. At some point, Mr. Chandler fell to the ground, but the four brothers continued attacking him. When a bystander approached, Corey, Horatio, and Zachary returned to the car and drove away, and Whitney left the area on foot.

---

[1]Whitney Batiste's full name is Whitney Adams Batiste. He is Corey, Horatio, and Zachary's brother.

Mr. Chandler ultimately died of multiple stab wounds. The subsequent police investigation led to the arrest and indictment of all four brothers. On January 16, 2002, in Lafayette Parish, the State filed an indictment charging Corey, Horatio, Zachary, and Whitney with second degree murder, a violation of La.R.S. 14:30.1.

On August 5, 2002, Corey, Zachary, and Horatio each pled guilty to the reduced charge of second degree battery, a violation of La.R.S. 14:34.1. Pursuant to their plea agreements, the three brothers were to testify truthfully at Whitney's trial. Whitney was tried for second degree murder, but the proceeding ended with a hung jury.

On August 14, 2002, the State filed a motion to rescind all three of the Adams' plea agreements. After a hearing on September 13, 2002, the trial court granted the motion with regard to Corey and Horatio but denied the motion as to Zachary. In August 2003, Corey, Horatio, and Whitney were tried and convicted by a jury of second degree murder.

Corey filed a motion for new trial, a motion for post-verdict judgment of acquittal, and a motion in arrest of judgment. On August 27, 2003, the trial court denied all three motions, then proceeded to sentencing. Corey, Horatio, and Whitney were sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence, as required by statute. They all seek review by this court. Corey assigns five errors; Horatio and Whitney each assign two errors.

### Errors Patent

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, one error regarding Corey's sentencing was found.

2

The language of La.Code Crim.P. art. 873 requires a delay of at least twenty-four hours between the denial of a motion for new trial or a motion in arrest of judgment and sentencing. Corey filed a motion in arrest of judgment, a motion for post-verdict judgment of acquittal, and a motion for new trial. All three motions were denied on the same date Corey was sentenced. There is no indication in the record that the twenty-four-hour delay was waived. Any error in this respect is harmless because Corey received a mandatory life sentence. *See State v. Porter*, 99-1722 (La.App. 3 Cir. 5/3/00), 761 So.2d 115; *State v. Williams*, 617 So.2d 557 (La.App. 3 Cir.), *writ denied*, 623 So.2d 1331 (La.1993).

### *Rescission of Plea Agreements*

On August 5, 2002, pursuant to a plea agreement, Corey, Horatio, and Zachary entered pleas of guilty to a lesser charge, second degree battery. The plea agreements were conditioned upon them testifying "truthfully" at Whitney's murder trial.

At Whitney's first trial, the three Adams brothers testified for the State. However, the jury was unable to reach a verdict, and the court declared a mistrial on August 7, 2002. Thereafter, the State filed motions to rescind the plea agreements of the three Adams brothers, alleging they did not testify truthfully at Whitney's trial. The trial court conducted a hearing on the State's motions and granted the motions as to Corey and Horatio, but denied the motion as to Zachary.

In *State v. Givens*, 99-3518, pp. 14-15 (La. 1/18/01), 776 So.2d 443, 455 (emphasis added), the supreme court addressed disputed plea agreements, explaining:

> In determining the validity of agreements not to prosecute or of plea agreements, Louisiana courts generally refer to rules of contract law, while recognizing at the same time that a criminal defendant's constitutional right to fairness may be broader than his or her rights under contract law. *See State v. Louis*, 94-0761, p. 7 (La.11/30/94), 645 So.2d 1144, 1148 (citing *State v. Nall*, 379 So.2d 731 (La.1980); *State*

3

*v. Lewis*, 539 So.2d 1199 (La.1989)). The first step under contract law is to determine whether a contract was formed in the first place through offer and acceptance. *Id.* at 1149; La.Civ.Code art. 1927. The party demanding performance of a contract has the burden of proving its existence. *Louis*, 645 So.2d at 1149. *In the context of plea bargains, a defendant may demand specific performance of the state's promise if he can show that the parties reached an agreement, that he performed his part of the agreement, and that in doing so, he relinquished a fundamental right. Id.* at 1149-50. *See also State v. Tanner*, 425 So.2d 760, 763 (La.1983).

The parties acknowledge that valid plea agreements existed. Therefore, we must determine whether Corey and Horatio performed in accordance with the terms of their plea agreements. The burden of proof is on them to establish that they complied with their plea agreements. *Id.*

No Louisiana case addresses the applicable standard of review in this situation. In *U.S. v. Ballis*, 28 F.3d 1399, 1409 (5th Cir.), *rehearing denied*, 39 F.3d 322 (5th Cir. 1994), the court held that "[a] district court's finding as to whether a defendant has breached a plea agreement will be overturned only if clearly erroneous." This standard of review applies to a trial court's factual findings during a hearing to suppress evidence. *State v. Casey*, 99-23 (La. 1/26/00), 775 So.2d 1022. We find the standard appropriate to this situation.

The State's acceptance of Corey's, Horatio's, and Zachary's pleas was premised on them cooperating and testifying truthfully in the prosecution of Whitney, as specified by the prosecutor:

> An absolute important plank of that agreement is that the defendants provide truthful cooperation in the trial of the remaining defendant, Whitney Adams Batiste. I would ask that each defendant declare that that is the foundation of this plea and the recommendation of the ultimate sentence the Court will deliver, that they will, in fact, provide truthful cooperation against that remaining defendant.

4

The trial court individually questioned Corey, Horatio, and Zachary regarding their understanding and agreement to testify "truthfully," and each affirmatively acknowledged that he understood that his plea agreement was based on his truthful cooperation and testimony at Whitney's trial. The prosecutor then stated the factual basis for the pleas. Again, Corey, Horatio, and Zachary were each asked whether the recited facts were correct, and each responded "yes."

During the hearing on the State's motions to rescind the plea agreements, the trial court made the following observations:

> Part of what [the prosecutor] stated [in the Boykinization] is that . . . "Out of nowhere, according to the defendants, came Whitney Batiste. Whitney Batiste appeared, produced a knife, which they have described as a brass knuckle knife that fits around the knuckles and extends the blade from -- folding out from the knuckles, and then began to stab, and stabbed repeatedly the victim."
>
> That was in the factual basis given by [the prosecutor]. It specifically stated that the defendants would testify that they saw Whitney Batiste stab the victim. And, in fact, all three of the defendants agreed with that factual basis.
>
> When time for testimony came, the only one who testified in accordance with that was Zachary Adams. *Horatio said he didn't see anybody stabbing anybody. And Corey said he didn't even see a knife. Now, that is not consistent with the factual basis that [the prosecutor] placed in the record.*
>
> . . . .
>
> *[W]hen Horatio got up to testify, he wouldn't say that he saw the stabbing. He said, I saw him swinging. That was not in accordance with what he indicated to [the prosecutor] that - - what his testimony would be, that he saw Whitney Batiste stab the victim. He wouldn't say it.*

(Emphasis added.)

While testifying at the first trial, Corey acknowledged that his failure to testify truthfully could result in the resumption of his murder prosecution. However, he

5

denied that he saw Whitney with a knife and testified that he did not see anyone stab Mr. Chandler. He argues that the trial court erred in allowing the State to rescind his plea agreement and in vacating his plea and sentence because the factual recitation was not part of the plea agreement. We disagree. The transcript of the plea hearing establishes that the factual basis *was* an integral part of the plea agreements and that Corey acknowledged that it was.

Corey also takes the position that nothing in the record evidences that he saw Whitney stab Mr. Chandler. In rejecting this argument, the trial court considered that he pled guilty in open court pursuant to the factual recitation which described Whitney's knife attack on Mr. Chandler. The trial court also considered his physical proximity to the stabbing, the fact that it was a multiple stabbing, and that eyewitnesses from farther away saw the stabbing. As the court observed, it would be incredible if Corey had not seen the stabbing, as he claimed at the first trial.

We find no error with the trial court's conclusion that Corey breached his agreement to testify truthfully against Whitney. Accordingly, we find no error with the trial court's rescission of his plea agreement.

Horatio contends that he complied with his plea agreement and testified truthfully regarding Whitney's role in Mr. Chandler's death. Horatio was evasive and not forthcoming with his testimony against Whitney at the first trial, and he admitted that he did not want to testify against his brother. However, the following colloquy reveals that, in answering the prosecutor's questions, he did testify that Whitney stabbed Mr. Chandler with a brass knuckle knife:

Q.    Did [Whitney] have a knife in his hand?

A.    Uh, yeah. Yeah.

6

Q. Whitney had a knife in his hands?

A. (Nodded head "Yes").

Q. What did that knife look like?

A. Uh, a brass knuckle knife.

. . . .

Q. How many knives did you see during that encounter?

A. One.

Q. Who had that knife?

A. Whitney.

Q. Did you see Whitney stab the old man with that knife?

A. I seen him swinging.

. . . .

Q. *Did you see anybody stab that old man, other than Whitney?*

A. *No.*

. . . .

Q. *What did - - Did Whitney actually use that knife on the old man?*

A. *Yep.*

(Emphasis added.)

Horatio's responses to the prosecutor's questions puts a knife like that described by the prosecutor at the plea hearing in Whitney's hands, has Whitney swinging the knife, and only Whitney stabbing Mr. Chandler with the knife. In light of this testimony, we find the trial court's finding that Horatio did not testify truthfully at the first trial was clearly erroneous. The rescission of his plea agreement is reversed.

7

### Sufficiency of the Evidence

Corey argues that the evidence adduced at trial was insufficient to support his conviction and that he was improperly convicted as a principal to the murder. He contends that the jury improperly transferred Whitney's intent to him and that the evidence failed to exclude every reasonable hypothesis of innocence.

In *State v. Myers*, 584 So.2d 242, 248-50 (La.App. 5 Cir.), *writ denied*, 588 So.2d 105 (La.1991), *cert. denied*, 504 U.S. 912, 112 S.Ct. 1945 (1992) (emphasis added), the court thoroughly discussed sufficiency of the evidence in a similar second degree murder case, explaining:

> Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. LSA-R.S. 14:30.1. Specific criminal intent exists when the circumstances indicate that the defendant actively desired the prescribed criminal consequences to follow his act. LSA-R.S. 14:10(1). . . . Furthermore, all persons concerned in the commission of a crime whether present or absent, and whether they directly commit the act constituting the offense, aid or abet in its commission, or directly or indirectly counsel or procure another to commit the crime are principals. LSA-R.S. 14:24.

> In evaluating the sufficiency of the evidence, the standard to be used by the appellate court is whether viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Mussall*, 523 So.2d 1305 (La.1988); *State v. DiLosa*, 529 So.2d 14 (La.App. 5th Cir.1988), *writ denied*, 538 So.2d 1010 (La.1989). . . . [A]ll evidence both direct and circumstantial must be sufficient under *Jackson* to satisfy a rational trier of fact that the defendant is guilty beyond a reasonable doubt. *State v. Porretto*, [468 So.2d 1142 (La.1985)].
> . . . .

> The severity of the attack on [the victim], in which she was bludgeoned to death with a baseball bat, indicates that the defendant had the specific intent to kill or to inflict great bodily harm when he struck her. *See State v. Richard*, 525 So.2d 1097 (La.App. 5th Cir.1988), *writ denied*, 538 So.2d 609 (La.1989). Further, the fact that both defendants were present when the victim was murdered and both had splatters of

8

blood on their clothing which matched the victim's could allow a rational trier of fact to find that both defendants were guilty, either by actually committing the offense *or by acting as a principal* to the offense.

The appellate court's primary function is not to redetermine a defendant's guilt or innocence in accordance with its appreciation of the facts and credibility of the witnesses. Rather, its function is to review the evidence in the light most favorable to the prosecution and determine whether there is sufficient evidence to support the verdict. *State v. Burrow*, 565 So.2d 972, 977 (La.App. 5th Cir.1990). From the totality of the evidence submitted by the prosecution, a rational trier of fact could have found that each defendant was either guilty of second degree murder or a principal to it.

Corey alleges that the State failed to prove that he had the specific intent to kill or inflict great bodily harm upon Mr. Chandler. While the bulk of the evidence indicated that Whitney was the person who actually stabbed Mr. Chandler, and there are some suggestions that Horatio may have stabbed him as well, the evidence showed that Corey initiated the altercation, that he used a broomstick to hit Mr. Chandler, that he punched him with his fists, and that he continued to beat him after he fell to the ground.

Corey's attorney argued that the evidence showed that Whitney acted independently when he stabbed Mr. Chandler and suggested that Corey had no way of knowing that Whitney, who approached the scene and joined the fight separately from his brothers, would stab him. Conversely, the State argued that Corey was obviously close enough to see Whitney stabbing Mr. Chandler, but he continued beating him.

Eyewitness Sandrika Comeaux testified that she saw Corey, whom she knew as "Snow," and two other men beating an "old man," and that Corey had a stick. At some point, a fourth man approached the scene, produced a knife, and stabbed the old man. According to Ms. Comeaux, the old man was already on the ground when the

9

fourth man stabbed him. Meanwhile, Corey and the other two men continued kicking him. Ms. Comeaux testified that her uncle, Christopher Isaac, then approached the scene and that Corey and the other men left the area when he did. According to Ms. Comeaux, the man who stabbed the old man departed on foot, while the other three left in a car driven by Corey.

Mr. Isaac testified to generally the same scenario. However, he stated that after the old man fell, Corey and two other men knelt down and continued punching him, rather than standing and kicking him as Comeaux's testimony suggested. Mr. Isaac also testified that Corey almost hit him with his car as he drove away and that as he did so he said "the old man deserved what he got." Another witness, Cindy Schwehm, testified that she saw three men beat Mr. Chandler by squatting and punching him and by kicking or stomping on him. Ms. Scwehm also testified that she heard someone in the car say, "Let a n_ _ _ _ _ die in peace," but could not identify the speaker. Another witness, Otis Broadway, also testified that as Corey drove away, he made a remark that Mr. Chandler deserved to die.

Thelma Joiner, Defendants' aunt, testified that the Adams brothers went to her house on the evening of Thanksgiving 2001 and that Horatio had a cut near one of his eyebrows and Corey's knuckles were "all cut up." Their injuries appeared to be fresh to Ms. Joiner. Approximately eleven hours after the incident, the arresting detective also noticed the abrasions on Corey's knuckles.

The jury could have reasonably concluded from this evidence that Corey had the specific intent to, at the least, inflict serious bodily harm on Mr. Chandler and that he was guilty of second degree murder or that he was a principal to second degree murder.

10

Alternatively, Corey contends that he acted in defense of his brother, Zachary. La.R.S. 14:20 states, in pertinent part:

A homicide is justifiable:

. . . .

(2) When committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention. The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing.

When a defendant in a homicide prosecution asserts that the homicide he committed was justified, the State bears the burden of proving beyond a reasonable doubt that the homicide was not committed in self-defense. *State v. Miller*, 98-642 (La.App. 3 Cir. 10/28/98), 720 So.2d 829, *writ denied*, 98-3119 (La. 5/14/99), 741 So.2d 659.

During the second trial, Zachary described a scenario in which Corey helped defend him from Mr. Chandler's advances. He testified that Mr. Chandler initially approached them and asked a question. Apparently thinking the man was asking about drugs, Corey answered in the negative. According to Zachary, Mr. Chandler then advanced and used an ink pen to cut him on the arm and on the back. It was at that time that Corey armed himself with a stick. However, while still under direct examination, Zachary refreshed his memory with a transcript from the first trial and acknowledged that his testimony in the two trials differed. Apparently, his prior testimony did not depict a scenario in which Chandler attacked first. Further, he became evasive and acknowledged that he did not want to get his brothers in trouble.

11

Given the evasive nature of some of Zachary's responses, and the fact that it was not consistent with his testimony from the first trial, the jury could reasonably have rejected his account of Corey defending him from Mr. Chandler. Further, even if the jury accepted Zachary's account of events, it did not justify Corey's act of continuing to beat Mr. Chandler while his brothers also attacked him.

For these reasons, we find that the State excluded justification and every reasonable hypothesis of innocence and proved its case against Corey Adams beyond a reasonable doubt. This assignment lacks merit.

### Excessive Sentence

Corey argues his life sentence for second degree murder is constitutionally excessive. A life sentence for second degree murder is mandatory, pursuant to La.R.S. 14:30.1. Regarding excessiveness claims for such sentences, this court has explained:

> [A] court may depart from a minimum sentence only if it finds that there is clear and convincing evidence that rebuts the presumption of constitutionality. *State v. Lindsey*, 99-3256, 99-3302 (La.10/17/00), 770 So.2d 339, *cert. denied*, 532 U.S. 1010, 121 S.Ct. 1739, 149 L.Ed.2d 663 (2001). To rebut the presumption, a defendant must show, by clear and convincing evidence, that, "because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case." *State v. Johnson*, 97-1906, p. 8 (La. 3/4/98), 709 So.2d 672, 676 (*quoting from Judge Plotkin's concurrence in State v. Young*, 94-1636, pp. 5-6 (La.App. 4 Cir. 10/26/95), 663 So.2d 525, 531, *writ denied*, 95-3010 (La.3/22/96), 669 So.2d 1223).

*State v. Paddio*, 02-722, pp. 16-17 (La.App. 3 Cir. 12/11/02), 832 So.2d 1120, 1131, *writ denied*, 03-402 (La. 2/13/04), 867 So.2d 682.

Corey has failed to prove by clear and convincing evidence the existence of unusual circumstances which demonstrate that he is "a victim of the legislature's

12

failure to assign sentences that are meaningfully tailored to [his culpability], the gravity of his offense, and the circumstances of [this] case." *Id.* Furthermore, he failed to prove any unusual circumstances warranting a departure from the mandatory minimum sentence provided by the legislature. His sentence is not constitutionally excessive. *State v. Ross*, 03-564 (La.App. 3 Cir. 12/17/03), 861 So.2d 888, *writ denied*, 04-376 (La. 6/25/04), ____ So.2d ____.

Other than an implication that the conviction itself was unconstitutional, Corey does not allege a basis for finding the sentence excessive. The basic claim of an unconstitutional conviction is not the proper subject of an excessive-sentence review, and Corey fails to specify why his conviction should be considered unconstitutional. He falls far short of rebutting the presumption that his sentence was proper.

This assignment lacks merit.

### *Double Jeopardy*

Corey next argues that he was subjected to double jeopardy. Prior to the first trial, he was sentenced to five years imprisonment pursuant to his plea agreements. Jeopardy attached at that time. La.Code Crim.P. art. 592. He claims his subsequent murder conviction was based upon the same set of facts that supported his guilty plea for second degree battery and that his trial after the plea rescission placed him in jeopardy a second time.

In *Ricketts v. Adamson*, 483 U.S. 1, 107 S.Ct. 2680 (1987), the defendant pled guilty pursuant to a plea bargain in which he agreed to testify truthfully against his co-defendants. Provisions of the agreement specified it would be completely nullified if the defendant did not meet his obligations thereunder. The defendant testified at his accomplices' trial, and they were convicted. However, their convictions were

13

then overturned on appeal, and the defendant refused to testify at the re-trials of the co-defendants because he felt he had met the obligations of his plea agreement by testifying at the first trial. The prosecutors pursued the original charge against him and secured a conviction. The defendant appealed, alleging that, in light of his prior guilty plea, the prosecution violated double jeopardy protections.

The Supreme Court held that Ricketts' prosecution did not violate double jeopardy principles because he breached his original plea agreement. In its reasoning, the Court noted that although there was no specific waiver of double jeopardy protections, the plea agreement specifically stated that a breach of the agreement would return the case to the status quo ante, which it equated to an explicit double jeopardy waiver, observing: "[R]espondent knew that if he breached the agreement he could be retried." *Id.* at 10, 107 S.Ct. at 2686.

The Court further noted that the breach ultimately stemmed from the defendant's voluntary action, *i.e.*, his refusal to testify at the retrial of the co-defendants and that he fully understood the consequences of the breach at the time of the plea hearing. The Court concluded that enforcement of the plea agreement did not violate the Double Jeopardy Clause. *See also U.S. v. Scott*, 437 U.S. 82, 99, 98 S.Ct. 2187, 2198 (1978), where the Supreme Court determined that "the Double Jeopardy Clause, which guards against Government oppression, does not relieve a defendant from the consequences of his voluntary choice."

Corey's situation is different from that of the defendant in *Ricketts* because his plea agreement did not explicitly state that a breach of the plea agreement would return his case to their pre-plea posture. However, it is clear from his testimony at the plea hearing and at the first trial that he knew that, if he failed to testify truthfully

14

regarding Whitney's actions in the death of Mr. Chandler, he could be tried for second degree murder. Knowing the consequences, he chose not to fulfill the requirements of his plea agreement. We find no violation of the Double Jeopardy Clause.

This assignment lacks merit.

### *Ineffective Counsel*

Corey next contends that his trial counsel was ineffective. His argument includes assertions regarding the content of private conversations he had with counsel which are not part of the record. For example, he alleges that his counsel repeatedly ignored him when he desired consultation and admitted to being racially prejudiced and to not properly representing him. These contentions cannot be considered without evidence and are deferred to post-conviction proceedings where a record can be developed regarding events that transpired between Corey and his trial counsel.

This assignment lacks merit.

### *Inconsistent Theories of Guilt*

Corey next argues that the State argued inconsistent theories of guilt in the two trials in violation of his due process rights. He urges that the State's theory in the first trial—Whitney was the lone killer and that he, Horatio, and Zachary were guilty of mere battery—is inconsistent and irreconcilable with the theory presented in the second trial—he, Whitney, and Horatio all contributed to Mr. Chandler's death. He cites various federal cases in support of his argument.

One of the cases Corey relies upon for this assignment is *Thompson v. Calderon,* 120 F.3d 1045 (9th Cir. 1997) (en banc), *rev'd on other grounds*, 523 U.S. 538, 118 S.Ct. 1489 (1998). In *Thompson*, two defendants were convicted of murder

15

in separate trials. The prosecutor presented different theories and motives for the defendants, as well as a completely different lineup of witnesses in each trial. Many of the witnesses presented contradictory stories when they testified. The prosecutor in *Thompson* did not just place different emphasis on the evidence, as in this case, he "manipulated evidence and witnesses, argued inconsistent motives, and at [the second defendant's] trial essentially ridiculed the theory he used to obtain a conviction and death sentence [in the first defendant's] trial." *Id.* at 1057. The Supreme Court found that these actions violated the Due Process Clause.

The prosecutor in this case did not present "inconsistent theories or facts" in these two trials. Rather, he emphasized the effect of Whitney's stab wounds on Mr. Chandler and de-emphasized the effect of the blows administered by Corey, Horatio, and Zachary in the first trial, leaving open the issue of the Corey, Horatio, and Zachary's culpability. In the second trial, he presented the same evidence by the same witnesses but with different emphasis on the effect the beating administered by Corey and Horatio had on Mr. Chandler. The theories of guilt in the two trials were clearly supported by the evidence and were not inconsistent.

This assignment lacks merit.

### *Defective Indictment*

Whitney argues the indictment was defective because it was accepted by a judicial district commissioner, rather than a judge. Citing this court's opinion in *State v. Umezulike*, 02-1165 (La.App. 3 Cir. 4/9/03), 843 So.2d 614, he analogizes the receipt of a grand jury report and supervision of the grand jury to the function of issuing probable cause warrants and contends that such an action was an improper exercise of adjudicatory power by the commissioner. Pursuant to *Umezulike*, he

16

argues that the commissioner was not constitutionally authorized to take such action. *Umezulike* has been reversed. *See State v. Umezulike*, 03-1404 (La. 2/25/04), 866 So.2d 794. In *Umezulike*, the supreme court concluded that the grant of authority to a commissioner to issue search warrants on probable cause was not unconstitutional, noting that there is no requirement that a warrant must be issued by a judge and that the probable cause determination is a quasi-judicial function.

Whitney also cites *State v. O'Reilly,* 00-2864 (La. 5/5/01), 785 So.2d 768, where the supreme court determined that the delegation of authority to a commissioner to conduct trials, accept pleas, and impose sentences in misdemeanor cases was found to be unconstitutional.

La.Const. art. V, § 1 provides: "The judicial power is vested in a supreme court, courts of appeal, district courts, and other courts authorized by this Article." La.Const. art. V, § 22(A) provides in part: "Except as otherwise provided in this Section, all judges shall be elected." "[O]riginal jurisdiction of all civil and criminal matters" is granted to district judges in La.Const. art. V, § 16(A).

Louisiana Revised Statute 13:716 authorizes the commissioner for the Fifteenth Judicial District Court and provides, in pertinent part:

> A. The commissioner of the Fifteenth Judicial District Court shall perform such duties as are assigned by the chief judge of the district in accordance with rules which shall be prescribed by the elected judges of the court, not inconsistent herewith or with the constitution and laws of the state.
>
> B. (1) The commissioner shall have all powers of a district judge not inconsistent with the constitution and laws of the state of Louisiana and the United States, including but not limited to the power to administer oaths and affirmations, take acknowledgments, affidavits, and depositions, sign orders, act in felony and misdemeanor charges, hear preliminary motions, accept pleas in misdemeanor cases including misdemeanor cases preliminary to trial on the merits, conduct trials of misdemeanor cases, fix bail, and sign and issue search and arrest

17

warrants upon probable cause being shown and in accordance with Paragraph (2) of this Subsection.

(2) In felony cases, the commissioner shall not try and adjudicate preliminary hearings, motions for discovery, motions to suppress, motions to quash, and trials on the merits. The commissioner may be designated and assigned to hear and determine any felony pretrial matter pending before the court, not inconsistent with the provisions of this Paragraph. The commissioner shall not adjudicate felony cases.

(3) In misdemeanor cases, the commissioner may be designated to hear, determine, and adjudicate any matter pending before the court.

In *O'Reilly*, 785 So.2d 768, the supreme court determined that the authorization of the commissioner for the Twenty-Second Judicial District "to accept guilty pleas, preside over and render verdicts, and impose sentences in misdemeanor matters was unconstitutional because they were unquestionably final determinations which involve the exercise of adjudicatory power" because this grant of authority allowed:

[T]he commissioner to exercise a portion of judicial power restricted by La. Const. art. V, §§ 1 and 22 to elected judges of authorized courts. The power to make the ultimate determination in a case must be exercised by duly elected judges. The commissioner, an unelected official, cannot lawfully exercise the adjudicatory power of the state. Subsection (E)(2)(e) of La. R.S. 13:719, which authorizes a non-elected person to exercise adjudicatory power, is therefore unconstitutional.

*O'Reilly*, 785 So.2d at 774.

Previously, in *Bordelon v. Louisiana Department of Corrections*, 398 So.2d 1103 (La.1981), the supreme court had considered the delegation of authority to a commissioner to conduct a hearing on a motion for an injunction and submit proposed findings of fact and recommendations to the district judge for disposition of the motion and determined that this did not unconstitutionally deny the movant "access to a constitutionally sanctioned court," reasoning:

Certain judicial power may be delegated without any abdication of the judge's fundamental responsibility for deciding cases. Delegation of power to conduct evidentiary hearings and to prepare proposed

18

findings of fact and recommendations for disposition based on the evidence and the arguments is not inconsistent with the constitution and laws which vest the judicial power in judges of enumerated courts, as long as the judges retain the responsibility for making ultimate decisions in the case. *Mathews v. Weber*, 423 U.S. 261, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976). Under R.S. 13:713, as under the Federal Magistrates Act attacked in the Mathews case, the authority and responsibility to make the final determination remains with the district judge. The fundamental responsibility of the judge to make the final determination, after the commissioner conducts a hearing and submits proposed findings and recommendations, is insured by the requirement of a de novo determination of disputed findings or recommendations. *Compare United States v. Raddatz*, 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980).

We conclude that this plaintiff's constitutional due process is adequately protected by the procedure outlined in R.S. 13:713, in which the trial judge makes a de novo determination of disputed findings or recommendations and may accept, reject, or modify those findings or recommendations or require additional evidence. We accordingly reject plaintiff's contentions that his constitutional rights are impaired by the designation of a commissioner to conduct a hearing and to submit proposed findings of fact and recommendations for disposition.

*Id*. at 1105 (footnotes omitted).

We are persuaded by the supreme court's reasoning in these cases that the opening of court to allow the grand jury to report on its proceedings is not an exercise of adjudicatory power. It is more akin to a ministerial duty than an exercise of adjudicatory power and is further removed from the judicial process than the conduction of hearings and making of recommendations to district judges for the disposition of matters and probable cause determinations.

This assignment is without merit.

### *Improper Joinder*

Whitney also argues that he was improperly tried jointly with Corey and Horatio in the second trial. He cites *State v. Thibodeaux*, 315 So.2d 769, 771 (La.1975) in which severance was held to be appropriate where one defendant's

defense was directly accusatory of his co-defendant requiring the co-defendant "to stand trial before two accusers, the state and [the defendant]." That is not the situation here. None of the defendants moved for a severance in this case, and none of them presented a defense which was accusatory of a co-defendant. Additionally, Whitney, Corey, and Horatio were jointly charged in one indictment, but no one filed a motion to quash based upon misjoinder. Louisiana Code of Criminal Procedure Article 495 provides that a misjoinder of defendants can only be urged by a motion to quash the indictment. The State argues that because no motion to quash was filed, the complaint was waived. We agree. *See State v. Grainer*, 02-703 (La.App. 4 Cir. 12/4/02), 834 So.2d 555, *writ denied*, 03-152 (La. 10/10/03), 855 So.2d 325.

Whitney also argues that he was prejudiced by the introduction of a letter written by Zachary to Corey in which he wrote: "You killed that man, huh." He urges that, even though the letter stated Corey killed Mr. Chandler, the jury probably got confused and relied on it to convict him. The letter was introduced by Whitney's own trial counsel; accordingly, Whitney cannot complain of its use at trial.

Whitney next suggests that his trial counsel was ineffective, under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052. It is not clear whether he is claiming ineffectiveness based upon the misjoinder issue, the introduction of the letter, or both. Due to this lack of clarity and the potential issues of trial strategy inherent in trying three co-defendant brothers facing trial simultaneously, this claim of ineffective assistance is deferred to the post-conviction process where a more complete record regarding trial counsel's actions can be developed. *State v. Bazar*, 99-752 (La.App. 3 Cir. 2/2/00), 758 So.2d 844.

This assignment lacks merit.

20

*Disposition*

The convictions and sentences of Corey Adams and Whitney Batiste are affirmed. The lower court's rescission of Horatio Adams' plea agreement is reversed; his conviction and sentence for murder are vacated; and his guilty plea and sentence for second degree battery are ordered reinstated.

**AFFIRMED IN PART; REVERSED IN PART; GUILTY PLEA OF HORATIO ADAMS AND SENTENCE FOR SECOND DEGREE BATTERY REINSTATED.**